**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SHEILA RILEY,**

**Plaintiff,**

**-vs-**                                              **Case No.  6:07-cv-1175-Orl-19KRS**

**ORANGE COUNTY BOARD OF COUNTY**
**COMMISSIONERS,**

**Defendant.**

_____

# ORDER

This case comes before the Court on the following:

1.    Dispositive Motion for Summary Judgment and Supporting Memorandum of Law
      by Defendant Orange County Board of County Commissioners (Doc. No. 35, filed
      May 16, 2008); and

2.    Affidavit of Statement in Opposition to Summary Judgment and Accompanying
      Documents (Doc. No. 37, filed June 13, 2008).

**Background**

Plaintiff Sheila Riley, a black female, brought this action *pro se* against Defendant Orange
County Board of County Commissioners alleging that Daniel Kucik, a white male and the Assistant
Chief in the Office of the Fire Marshal, Orange County Fire and Rescue Department, retaliated
against her for engaging in protected activities under Title VII of the Civil Rights Act of 1964, 42
U.S.C. §§ 2000e to 2000e-17 (2006).  (Doc. No. 1, filed July 16, 2007.)

## I.       Material Facts About Which There Is No Genuine Dispute

Plaintiff began working for the Orange County Fire and Rescue Department ("FRD") on January 11, 1999.  (Doc. No. 1 at 1, ¶ 5; Doc. No. 12 at 2, ¶ 5.)  Throughout her employment, Plaintiff worked as a municipal fire inspector.  (Doc. No. 1 at 1, ¶ 5; Doc. No. 12 at 2, ¶ 5.)  During the course of her employment, Plaintiff's direct supervisors were, in chronological order, Rick Schultz, William Duxbury, Debbie Marshall, and Frank Raike.  (Doc. No. 35-3 at 23-24.) Chief Daniel Kucik managed the FRD, and "Chief Middleton . . . was Chief Kucik's boss."  (*Id.* at 25.)

Several months after Plaintiff began her employment, conflicts developed between Plaintiff and Chief Kucik.  (Doc. No. 35-4 at 3.)  For example, Rick Schultz and Chief Kucik decided that the new municipal fire inspector hires, including Plaintiff, would be required to pass a math test.  (*Id.* at 4-6.)  This had not been a requirement when Plaintiff was hired; therefore, she filed a verbal complaint with human resources.  (*Id.* at 7-9.)  As a result of her complaint, Plaintiff was not required to take the test.  (*Id.* at 9.)  Also around this time, Plaintiff received a letter from Chief Kucik indicating that she was no longer a temporary employee but had become a permanent employee.  (*Id.* at 9-10.)  This letter upset Plaintiff because she believed that she was hired as a permanent employee; however, Plaintiff did not complain about the letter to human resources.  (*Id.* at 11-14.)

Next, in 2002 and 2003, Plaintiff "had some disagreements with [her] performance appraisal[s] that [Chief Kucik] signed and agreed with."  (*Id.* at 14.)  Though her direct supervisors completed the evaluations, Chief Kucik approved them; therefore, Plaintiff felt that Chief Kucik was ultimately responsible for their content.  (*Id.* at 14-25; Doc.  No. 35-5 at 1-8.) Plaintiff objected to the accuracy of the comments on her evaluations and further claimed that she had not been given

any notice or opportunity to improve her conduct before the evaluations were completed.  (Doc. No. 35-4 at 15-16.)  Plaintiff was particularly concerned about receiving a "below target" rating because this rating precluded her from receiving an annual raise.  (*Id.* at 17; Doc. No. 35-5 at 9.)  Since there was no formal grievance procedure available for performance evaluations, Plaintiff spoke with "Chief Plaugher"[1] about her concerns.  (Doc. No. 35-4 at 16-17.)  After this meeting, Plaintiff's rating was changed to her satisfaction from "below target" to "on target."  (*Id.* at 17.)

Plaintiff believed that she was treated unfairly again in her 2003 performance evaluation.  (*Id.* at 18-20.)  Plaintiff explained that her evaluator, Lieutenant Duxbury, was personally biased against her, and that Chief Kucik affirmed this bias by signing the evaluation.  (*Id.*)  Plaintiff spoke with Chief Kucik about this, but he was unwilling to change her evaluation.  (*Id.* at 23.)  She then went to Chief Middleton who also did not change her evaluation.  (*Id.*)  Finally, Plaintiff emailed Chief Plaugher and filed a written grievance.  (*Id.* at 23-25; Doc. No. 35-5 at 1.)  According to Plaintiff, "They eventually changed [her evaluation]."  (Doc. No. 35-4 at 23.)

In 2004, Plaintiff felt that she continued to be treated unfairly.  (Doc. No. 35-4 at 22-23; Doc. No. 35-5 at 1-3, 8.)  For instance, Plaintiff received several "supervisory observation forms" from Lieutenant Duxbury and Chief Kucik in which they commented negatively on her job performance, and she perceived this as a form of harassment.  (Doc. No. 35-6 at 2.)  As a result, Plaintiff filed a harassment and intimidation complaint with the Orange County Office of Professional Standards ("OPS").  (Doc. No. 35-5 at 2-3, 8.)  She filed the complaint in May of 2004 against her direct

---

[1]     Apparently Chief Plaugher was above Chief Kucik in the hierarchy of the Orange County Fire and Rescue Department.  (Doc. No. 35-9 at 22 ("[The commissioner] said to contact Kucik's boss, which was Plaugher.").)

supervisor, Lieutenant Duxbury, and she added Chief Kucik to the complaint in June.  (*Id.* at 20; Doc. No. 37 at 1; Doc. No. 35-8 at 10, 13.)

OPS interviewed Plaintiff about her complaint on June 17, 2004.  (Doc. No. 35-5 at 21; Doc. No. 37 (Ex. 2).)  During the interview, Plaintiff was asked about a "Predetermination Hearing" that had previously been scheduled for June 22, 2004 by Chief Kucik.  (Doc. No. 35-5 at 8, 22.)  A Predetermination Hearing is "a formal hearing designed to allow for the review of facts surrounding an alleged violation of County policies or operation regulations and, through this process, determine the appropriate disciplinary [action]."  (Doc. No. 35-2 at 3, ¶ 9.)  Plaintiff told OPS that she did not believe that the Predetermination Hearing had anything to do with her filing of the complaint.  (Doc. No. 35-5 at 22-24; *accord* Doc. No. 35-8 at 19-21, 24.)  However, at her deposition, Plaintiff instead stated, "It may have–it may have a little."  (Doc. No. 35-5 at 22-24; *accord* Doc. No. 35-8 at 19-21, 24.)  After conducting an investigation, OPS determined that there had not been any harassment. (Doc. No. 35-6 at 5-6; Doc. No. 37 (Ex. 3).)  The record does not reveal the outcome of the June 2004 Predetermination Hearing.

In early 2006, the FRD received a citizen complaint against Plaintiff concerning an incident that occurred on January 20, 2006.  (Doc. No. 35-6 at 13-14.)  On that day at around 11:00 A.M., Plaintiff went to a house owned by her sister and rented to John and Stephanie Meo.  (*Id.*; Doc. No. 37 (Ex. 28).)  The Meos had stopped paying their rent, and Plaintiff's sister had initiated legal proceedings to have them evicted.  (Doc. No. 35-6 at 14; Doc. No. 37 (Ex. 28).)  Also, the house was in foreclosure, and Plaintiff wanted "to show the house to [a] realtor . . . ."  (Doc. No. 35-6 at 14.) On January 20, when she and a realtor went to the house, Ms. Meo was there.  (*Id.*)  Plaintiff was in her fire inspector uniform at the time.  (*Id.*)  Plaintiff asked Ms. Meo if she and the realtor could

enter, and Ms. Meo said that was alright but asked them to wait a minute to give her an opportunity to clean up.  (*Id.*)  Then, as Plaintiff explains, "I'd say about five, seven minutes later she came out very hostile, so me and the realtor looked at each other like, we're not getting anywhere so, you know, let's just go.  We left."  (*Id.*)  After this encounter, Plaintiff met with three coworkers for lunch: Davinia Burns, Viola Kelly, and Annette Taylor.  (*Id.* at 15.)  Plaintiff recalls arriving at the restaurant around 11:30 A.M. and leaving at approximately 1:00 P.M.  (*Id.* at 16.)

A few days later, Plaintiff left for a vacation and returned on January 31, 2006.  (*Id.*)  Upon her return, Plaintiff received a memorandum from Chief Kucik dated January 26, 2006.  (*Id.*; Doc. No. 37 (Ex. 8).)   In this memorandum, Chief Kucik notified Plaintiff that she was under investigation by OPS.  (Doc. No. 37 (Ex. 8).)  He explained, "On Monday, January 23, 2006[,] Ms. Stephanie Meo . . . contacted the [Office of the Fire Marshal] to file a formal complaint against you concerning your behavior surrounding an incident that allegedly occurred on Friday, January 20, 2006 and two other encounters during the past few months."  (*Id.*)  Ms. Meo had alleged that Plaintiff used her position as a municipal fire inspector "to intimidate and threaten [Ms. Meo's] family and her on issues surrounding a rental property" and "used inappropriate language and behavior to her during these encounters, unbecoming a county employee."  (*Id.*)  Therefore, Chief Kucik restricted Plaintiff to office duties, stated she was no longer allowed to operate a county owned vehicle, and prohibited her from having any further contact with Ms. Meo.  (*Id.*)

In her deposition, Plaintiff agreed that "if [Ms. Meo] hadn't accused [Plaintiff] . . . if she hadn't gone to Chief Kucik, [there was] no other reason that [Chief Kucik] would have taken [Plaintiff] from the duties that [Plaintiff was] doing and moved [Plaintiff] to an office . . . ."  (Doc.

No. 35-7 at 19.)  However, Plaintiff felt that it was unfair for Chief Kucik to reassign her without

any discussion and without giving her an opportunity to explain her side of the story.  (*Id.* at 20.)

According to Plaintiff, on February 9, 2006, "we [the fire inspectors] as minorities had a

meeting with Chief Kucik and the new battalion chief that came in, which was Kevin Wiltz . . . ."

(Doc. No. 35-5 at 15.)  Plaintiff explained that "we as minorities" meant "[a]ll of us minorities that

had an issue with Chief Kucik."  (*Id.*)  She described the topics of conversation as follows:

> It was all minority.  Because we all have lunch together and we notice different
> things, different discipline with different people, you know.  And we know that a
> certain person has been doing several things over and over and over and over and
> never been disciplined, but we are disciplined different as minorities.

(*Id.* at 16; *see also* Doc. No. 37 (Ex. 4).)  Chief Wiltz, a black male, promised to "try to work on the

issues."  (Doc. No. 35-5 at 18.)  Plaintiff did not feel that anything really changed as a result of the

meeting.  (*Id.* at 19.)  However, she believes that her participation in this meeting "possibly . . .

could have" caused Chief Kucik to retaliate against her.  (Doc. No. 35-8 at 18, 23.)  Chief Kucik did

not terminate any other employees who attended the February 9 meeting.  (*Id.* at 16-18.)

Meanwhile, OPS continued to conduct an internal investigation of Plaintiff's conduct on

January 20, 2006.  (Doc. No. 35-5 at 13, 17-19.)  Both Ms. Meo and the realtor present at the time

of the confrontation had filed citizen complaints.  (*Id.* at 22.)  On April 21, 2006, OPS issued a

report in which it determined that the complaints against Plaintiff were valid.  (*Id.* at 13, 17-19; Doc.

No. 37 (Ex. 24).)  OPS also notified Plaintiff of a Predetermination Hearing concerning these

findings on May 22, 2006 before Chief Kucik.  (Doc. No. 35-2 at 3, ¶ 9; Doc. No. 35-5 at 13, 17-19.)

At the predetermination hearing, Chief Kucik found that Plaintiff had violated a number of

departmental rules and policies.  (Doc. No. 35-5 at 19-20.)  In a letter dated June 5, 2006, Chief

Kucik summarized his findings and informed Plaintiff that she had "willfully and intentionally made

false written statements on [her] daily activity report dated 1/20/06 to disguise [her] personal business matter and conceal [her] whereabouts." (Doc. No. 37 (Ex. 7 at 1).)  He also found that on January 20, 2006, Plaintiff "willfully and knowingly conducted personal business (showing real estate) while on duty, in [her] fire department uniform, and in [her] county fire department vehicle." (*Id.*)  Further, Chief Kucik stated that Plaintiff "willfully and knowingly used [her] position as an Orange County Fire Inspector, [her] fire department uniform, and [her] county fire department vehicle to influence and encourage an Orange County citizen to cooperate with a real estate matter." (*Id.*)  Due to these and other findings, including a determination that Plaintiff "willfully and knowingly provided false verbal statements at the Predetermination Hearing," Chief Kucik concluded that Plaintiff had violated eleven departmental rules and policies. (*Id.* at 2-3.)  He then stated, "After considering all information and testimony presented, reviewing violations of policy and taking into consideration your employment history, it is my decision to terminate your employment with the Orange County Fire Rescue Department effective June 7, 2006." (*Id.* at 3.)

As a county employee, Plaintiff had the right to challenge the findings of OPS and Chief Kucik's decision through a three-step grievance process. (Doc. No. 35-2 at 3, ¶ 12.)  The first step was the Predetermination Hearing. (*Id.*)  Next, Plaintiff was entitled to a Step II Grievance Hearing. (*Id.*)  Deputy Fire Chief James Fitzgerald heard Plaintiff's Step II grievance and upheld Chief Kucik's termination of Plaintiff. (Doc. No. 35-7 at 24-25; Doc. No. 35-8 at 1; Doc. No. 37 (Ex. 10).)  Lastly, Plaintiff requested a Step III Grievance Adjustment Board ("GAB") hearing. (Doc. No. 35-8 at 1.)  The GAB, consisting of Jerry Demings, the Deputy County Administrator, Mike Brandt, the Fire Training Division Chief, and Laurie Sweeney, the Treasurer of the International Association of Fire Fighters Local 2057, heard Plaintiff's grievance on October 3, 2006. (Doc. No. 35-2 at 4,

¶ 14.)  The GAB voted two-to-one to deny Plaintiff's grievance and uphold the decision to terminate.  (*Id.*; Doc. No. 35-5 at 23; Doc. No. 35-7 at 8-9; Doc. No. 35-8 at 4; Doc. No. 37 (Ex. 12).)

Plaintiff believed that OPS, Chief Kucik, Chief Fitzgerald, and the GAB ignored evidence in her favor and instead put full confidence in the citizen complaints and the inconsistent testimony from her coworkers concerning the timing of the January 20, 2006 incident.  (Doc. No. 35-7 at 21-24.)  Plaintiff also felt that her termination constituted an unfair labor practice because it was not negotiated with the union.  (Doc. No. 35-6 at 25.)  The union filed a grievance on her behalf, but the grievance was denied and not appealed.  (*Id.*; Doc. No. 35-7 at 1.)

Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") stating that she felt she was unfairly terminated by Chief Kucik, the person against whom she had complained of harassment.  (Doc. No. 35-7 at 1-2.)  Plaintiff noted that her direct supervisor at the time, Lieutenant Raike, was not involved in the decision.  (*Id.* at 2.)  Thus, Plaintiff accused only Chief Kucik of retaliation and further indicated that she was the only employee terminated due to his retaliation.  (*Id.* at 6-8; Doc. No. 35-9 at 16-17.)  In her deposition, Plaintiff explained, "I would say [that the termination was] retaliation because [Chief Kucik] didn't follow the rules, he didn't follow the procedures and due to the complaints that I filed against him and the conflict of interest that I had against him. . . .  He retaliated due to prior instances."  (Doc. No. 35-9 at 1-2.)

## II.     Procedural History

Upon receiving a Notice of Right to Sue letter from the EEOC, Plaintiff filed a Complaint against the Orange County Board of County Commissioners on July 16, 2007.  (Doc. No. 1.)  The

sole count of the Complaint alleged that Chief Kucik retaliated against Plaintiff by terminating her employment in violation of Title VII.  (*Id.*)

Pursuant to the Case Management and Scheduling Order issued on December 11, 2007, amended pleadings were due by January 7, 2008.  (Doc. No. 24 at 1.)  On January 10, 2008, Plaintiff filed an untimely Motion to Amend the Complaint to add a race discrimination claim.  (Doc. No. 28.)  The Court denied this Motion without prejudice for failing to comply with Local Rule 3.01(g). (Doc. No. 29, filed Jan. 14, 2008.)  Over a month later, Plaintiff conferred with opposing counsel and offered notice to the Court that opposing counsel objected to an amended complaint.  (Doc. No. 33, filed Feb. 20, 2008.)  Plaintiff never renewed her Motion to Amend.  Thus, the only claim pending before the Court is Plaintiff's claim of retaliation.[2]  Defendant has moved for summary judgment on this claim, and Plaintiff opposes this Motion.  (Doc. Nos. 35, 37.)

### Standard of Review

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Hickson Corp.*, 357 F.3d at 1259.  An issue of fact is

---

[2]     Plaintiff discusses a discrimination claim in her Affidavit of Statement in Opposition to Summary Judgment, as well as a possible hostile work environment claim.  (Doc. No. 37 at 7-8.)  However, a plaintiff may not raise new, unpled claims in response to a motion for summary judgment. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam).  Therefore, the Court must disregard Plaintiff's arguments concerning these putative claims.  *Id.*

"genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## Analysis

This action was brought under the anti-retaliation provision of Title VII which prohibits discrimination against an employee for engaging in activity deemed protected under the statute. 42 U.S.C. § 2000e-3(a). A *prima facie* case of retaliation under Title VII requires a plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the

adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). Once a plaintiff establishes her *prima facie* case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* (quoting *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997)). If the employer offers such legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation. *Id.* (quoting *Holifield*, 115 F.3d at 1566).

Defendant argues that Plaintiff's case fails as a matter of law at the *prima facie* stage because Plaintiff has been unable to produce evidence raising a genuine issue of material fact that a causal connection exists between her protected activity and the adverse employment action. (Doc. No. 35 at 6-9.) To survive summary judgment on the causal connection element, a plaintiff must present evidence that the protected activity and the negative employment action are "not completely unrelated." *Holifield*, 115 F.3d at 1566 (quoting *E.E.O.C. v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). "'A plaintiff satisfies this element if [s]he provides sufficient evidence' of knowledge of the protected expression and 'that there was a close temporal proximity between this awareness and the adverse . . . action.'" *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)). A "close temporal proximity" between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. *Id.* (citing *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)). The Eleventh Circuit has "held that a period as much as one month between the protected expression and the adverse action is not too protracted." *Id.* (citation omitted). However, as the Eleventh Circuit further explained:

The Supreme Court has stated that "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citations omitted). The Court cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection. *See id.* (citing *Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)). If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.

*Id.*

Plaintiff claims that Chief Kucik retaliated against her for her involvement in protected activities that took place in May 2004 and February 2006. (Doc. No. 37 at 1-2.) According to Plaintiff, Chief Kucik retaliated by terminating her employment in June of 2006. (Doc. No. 1 at 2, ¶ 9; Doc. No. 37 at 2.) However, Plaintiff has failed to offer any evidence beyond mere speculation that the protected conduct was in any way related to her termination. For example, in her Affidavit of Statement in Opposition to Summary Judgment, Plaintiff merely asserts, "The Plaintiff['s] termination was in retaliation of [sic] Plaintiff's protected conduct." (Doc. No. 37 at 2.) Plaintiff has not provided any direct evidence that Chief Kucik retaliated against her. While circumstantial evidence may support an inference of retaliatory motive sufficient to survive summary judgment, Plaintiff has provided no such evidence. The first instance of protected conduct occurred two years prior to Plaintiff's termination, and the second instance occurred almost four months before her termination. (*Id.*) Pursuant to Eleventh Circuit precedent, such a delay between the protected conduct and the termination may not support an inference of causation as a matter of law. *E.g.*, *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We are not persuaded that three months . . . is sufficiently proximate to show causation."); *Higdon*, 393 F.3d at 1221 ("By itself, the three month period . . . does not allow a reasonable inference of a causal relation between the protected

expression and the adverse action."); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) ("Aside from the temporal proximity, [Plaintiff] introduced virtually no evidence of a causal connection.  In light of the other evidence in the record, the three and one-half month temporal proximity is insufficient to create a jury issue on causation. We conclude that [Plaintiff] failed to adduce sufficient evidence to permit a reasonable jury to find for her."); *see also Ames v. Verizon Data Servs., Inc.*, No. 8:07-cv-698-T-24TGW, 2008 WL 3927262, at *4 (M.D. Fla. Aug. 21, 2008) ("The required temporal proximity is not a clearly-bounded concept, but it likely requires that the adverse employment action take place less than three months after the adverse actor's discovery of the protected activity.").  Because Plaintiff failed to meet her burden to offer evidence of a causal connection between her protected activities and her termination, Plaintiff has not established a *prima facie* case of retaliation in violation of Title VII.  Therefore, the Court must grant Defendant's Motion for Summary Judgment.

## Conclusion

Based on the foregoing, the Court **GRANTS** Defendant's Dispositive Motion for Summary Judgment.  (Doc. No. 35, filed May 16, 2008.)  Judgment shall be entered for Defendant Orange County Board of County Commissioners and against Plaintiff Sheila Riley.  The Clerk of the Court is directed to close this case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on October 3, 2008.

**PATRICIA C. FAWSETT, JUDGE**
**UNITED STATES DISTRICT COURT**

Copies furnished to:

Counsel of Record
Unrepresented Party